

Opinions of the United
States Court of Appeals
for the Third Circuit

3-10-2006

# Titterington v. Comm Social Security

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2676

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Titterington v. Comm Social Security" (2006). *2006 Decisions.* Paper 1454.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1454

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-2676

JAMES R. TITTERINGTON,
                              Appellant

v.

JO ANNE B. BARNHART, COMMISSIONER
OF SOCIAL SECURITY

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
D.C. Civil 04-cv-00117E
District Judge:  The Honorable Sean J. McLaughlin

Submitted Under Third Circuit LAR 34.1(a)
February 10, 2006

Before: SCIRICA, Chief Judge, BARRY and FISHER, <u>Circuit Judges</u>

(Opinion Filed:   March 10, 2006 )

OPINION

BARRY, <u>Circuit Judge</u>

James Titterington is forty-four.  He worked in a variety of skilled and semi-skilled

mechanical and construction jobs between 1977 and 2001.  In December 2000, he began to suffer from dizziness and fainting, medically known as syncope.  An Administrative Law Judge ("ALJ") in the Social Security Administration ("SSA") held that Titterington was not entitled to disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), a decision upheld by the District Court.  The ALJ's determination that Titterington was not disabled within the meaning of the Social Security Act was supported by substantial evidence.  Accordingly, we will affirm.

## I.

Because we write for the parties, we omit a discussion of facts not relevant to our disposition of this appeal.  Titterington, who has smoked a pack of cigarettes a day since the age of sixteen, has a severe cough.  On New Year's Eve in 2000, he fainted during a coughing episode and fell, hitting a counter and injuring his nose.  Over the next two years, Titterington saw at least six doctors and underwent dozens of tests to determine the etiology of his increasingly frequent syncopal episodes, which now average two to three per week.[1]  The syncope has never been reproduced clinically and none of the doctors has

---

[1] Tests administered to Titterington included physical exams, cranial nerve exams, Holter monitor, event monitor, tilt table test, treadmill stress test, nerve conduction study, echocardiogram, CT chest scan, duplex carotid sonography, MRI, MRA, MRV, EKG, EMG, EEG, spinal tap, transcranial doppler ultrasound, and chest x-ray. The tests were all negative for any condition that could generate Titterington's syncope. The tests did reveal a benign adenopathy in the mediastinum and/or pulmonary hilus, congenital anisocoria, and the possibility of hyperkinetic heart syndrome, emphysema, and asthma. Titterington does not contend that these conditions render him disabled other than through his syncope.

been able to produce a definitive diagnosis of its etiology or a therapy guaranteed to eliminate it. None of the many drugs Titterington has been prescribed has significantly affected his syncope.[2]

All of the information about the actual symptoms of the syncope was provided by Titterington to his doctors. In addition to the initial fall, particularly severe incidents have included an automobile accident in which his car went off an embankment, a triple fracture of his right zygomatic arch (repaired in an outpatient procedure), and a fall in his bathroom that broke the fiberglass fixtures there. During his syncopal episodes, he feels off-balance and sees fuzzy red spots before losing consciousness. When he awakes, he is disoriented and exhausted and often has a severe headache. Sometimes he can tell when an episode is coming; at other times episodes come on without warning. At first, his syncopal episodes followed coughing spells. Most still do. According to Titterington, however, a third of his syncopal episodes are not associated with coughing. He stated to one doctor that he had been able to avoid passing out by sitting down when he felt lightheaded. He also reported sleep problems. At his doctors' advice, he stopped working in March 2001 and stopped driving in December 2001.

Titterington has primarily seen Joseph Gent, M.D., an internist, for diagnosis and treatment of his syncope. In January 2001, Dr. Gent believed that the initial episode was

---

[2] His doctors have recommended two antibiotics, a bronchodilator, an anti-inflammatory agent, an anti-allergen, a cough suppressant, decongestants, a beta-blocker, painkillers, an anti-migraine drug, an anti-acid reflux drug, and support stockings.

cough-induced and diagnosed Titterington with bronchitis. In May 2001, Dr. Gent diagnosed with him "syncope secondary to cough." In August 2001, Dr. Gent believed that Titterington's syncope was caused by his cough, that suppressing the cough would suppress the syncope, and that Titterington was capable of suppressing the cough. In December 2001, Dr. Gent assessed him as having "syncopal episodes" and vertigo but still did not know the etiology of the syncope. Dr. Gent diagnosed a respiratory infection and rhinitis in April 2002 and bronchitis in May 2002, which cleared up after treatment with antibiotics. Also in May 2002, Dr. Gent advised Titterington to quit smoking. In September and October 2002, Dr. Gent again concluded that the syncope's etiology was unknown.

Dr. Gent referred Titterington to James McLaughlin, D.O., a neurologist, who diagnosed a cough and syncope in March 2001, and in December 2001 found "syncopal episodes associated with cough." Dr. McLaughlin "continue[d] to feel that this is likely cough syncope." Also in 2001, Dr. Gent referred Titterington to Manuel Forero, M.D., a cardiologist. Dr. Forero conducted a number of tests but did not reach a more definite diagnosis than "syncope."

In 2002, Dr. Gent referred Titterington to the Cleveland Clinic for testing. Titterington first met with Robert Shields, M.D., a neurologist. Dr. Shields evaluated Titterington's condition as consistent with neurocardiogenic syncope, although the disorientation and headache suggested seizure or migraine. Another doctor at the

4

Cleveland Clinic, F.M. Fouad-Tarazi, M.D., diagnosed him with "syncopal spells probably neurocardiogenic some induced by cough," chronic obstructive pulmonary disorder ("COPD") induced by smoking, and headaches. A third doctor at the Cleveland Clinic, Georges Juvelekian, M.D., diagnosed syncope, partly cough-induced, with the cough exacerbated by COPD, post-nasal drip, and gastroesophageal reflux disease. He told Titterington to stop smoking. Dr. Shields's October 23, 2002 letter summarizing the results of the Cleveland Clinic tests ruled out several causes for the syncope, found that the episodes were most often cough-induced neurocardiogenic syncope, and stated that controlling the cough would help.

Dr. Gent completed a Residual Functional Capacity ("RFC") evaluation indicating that Titterington could work for four days in a week but not a full-time week, and could not work at substantial and gainful employment. Specifically, he indicated that Titterington: could sit, stand, walk, or sit/stand combined for less than two hours each in the work day; could lift and carry up to ten pounds a third of the day and twenty pounds less than a third of the day; could not crawl, climb, or reach above shoulder level; could bend and squat for less than a third of the day; could be exposed to changes in temperature and humidity; and could not be exposed to heights, machinery, driving, dust, fumes, or gasses.

A state-conducted RFC evaluation in March 2002 found Titterington capable of full-time work. It indicated that Titterington could occasionally climb stairs and

5

frequently stoop, kneel, crouch, and crawl, but should never be required to climb a ladder or balance and should avoid exposure to fumes and hazards. It found no exertional limitations. A state review found no medically determinable mental impairments.

## II.

Titterington applied for DIB and SSI on February 20, 2002, with a protective filing date of January 18, 2002. He claimed that he had been disabled as of March 3, 2001. The SSA denied his application on April 2, 2002, and he requested a hearing.[3] A hearing was held by the ALJ on November 13, 2002. Titterington testified to substantially the same symptoms he had described to his doctors. He has two to three spells a week in which he loses consciousness; most but not all are cough-related. He continues to smoke a pack of cigarettes daily. A vocational expert also testified that an individual unable to perform work above a light exertional level or to be exposed to hazards could not fulfill the work requirements of any of Titterington's past jobs. An individual who could perform only unskilled sedentary work could nonetheless work as a cashier, alarm monitor, or hand packer. Finally, an individual with dizzy spells two to three times a week (each requiring the individual to be off task between thirty minutes and two hours) could not perform any job in the national economy on a full-time basis.

The ALJ issued a written decision on February 14, 2003 denying Titterington's

---

[3] Titterington's application was processed under a test program that did not provide for an agency reconsideration between the initial determination and the hearing. See 20 C.F.R. §§ 404.906(b)(4), 416.1406(b)(4).

application and finding him not disabled.  The Appeals Council received additional evidence and denied his request for review on March 12, 2004.  Titterington brought suit in the United States District Court for the Western District of Pennsylvania, and cross motions for summary judgment were filed.  On February 18, 2005, a magistrate judge issued a report and recommendation that the decision of the ALJ be affirmed.  The District Court reviewed the record, adopted the recommendations of the report, and granted the government's motion for summary judgment in an order dated March 24, 2005.  Titterington filed a timely notice of appeal.

## III.

 The District Court had jurisdiction under 42 U.S.C. § 405(g).  We have jurisdiction under 28 U.S.C. § 1291.  The decision of the ALJ must be supported by substantial evidence.  42 U.S.C. § 405(g); Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003).  "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552, 565 (1988)).

## IV.

The Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

7

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity includes not just the claimant's former work but "any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A). A "physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). The claimant bears the burden of establishing a disability.[4] 20 C.F.R. §§ 404.1512, 416.912.

Disability determinations are evaluated using a five-step process. 20 C.F.R. §§ 404.1520, 416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe medically determinable impairment; (3) if so, whether the impairment meets or equals one of the listings in 20 C.F.R. pt. 404 subpt. P, app. 1; (4) if not, whether the claimant's residual functional capacity permits him to perform his past work; and (5) if not, whether the claimant's RFC, age, education, and work experience permit him to perform any other work that exists in the national economy in substantial numbers. Id.; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

---

[4] Although the burden shifts to the Commissioner to show that other jobs that the claimant could perform exist in significant numbers in the national economy, Rutherford v. Barnhart, 399 F.3d 546, 551 (3d Cir. 2005), Titterington does not contend that the Commissioner failed to show that significant numbers of appropriate jobs existed for one with the residual functional capacity the ALJ determined that Titterington had. He challenges only the ALJ's determination of the RFC itself.

At step one, the ALJ found that Titterington was not engaged in substantial gainful activity. At step two, the ALJ found that Titterington's syncope was severe.[5] At step three, the ALJ found that Titterington's condition was not severe enough to meet or equal any of the listed impairments. Neither party challenges the findings at the first three steps.

Before proceeding to step four, the ALJ determined Titterington's RFC. The ALJ discussed both Dr. Gent's opinion that Titterington could not engage in full-time work and the state agency's opinion that Titterington had no exertional limitations. The ALJ discounted the state agency's opinion because it was produced by an adjudicator, not a medical expert. He found that Titterington could perform full-time sedentary work, but could not be exposed to hazards such as heights or dangerous machinery, and could not be exposed to poor ventilation, or extremes of dust, humidity, or temperature. See 20 C.F.R. §§ 404.1568(a), 416.968(a), 416.967(a).

Titterington objects on two grounds to the finding that he was capable of performing full-time sedentary work. He argues, first, that the ALJ incorrectly concluded, without substantial evidence, that his syncope was entirely cough-induced. Because a cough-induced syncope could be controlled by controlling the underlying cough, the ALJ concluded that it would not prevent Titterington from performing

---

[5] The ALJ also found that Titterington's headaches were not severe, a finding Titterington challenged before the District Court but not in the present appeal.

9

sedentary work. Titterington argues, however, that a third of his syncopal episodes are not cough-induced and are, therefore, uncontrollable. He claims that the ALJ improperly ignored the uncontradicted testimony of numerous doctors that the syncope has unknown etiology and that many of the syncopal episodes were not induced by coughing.

The ALJ's diagnosis of cough-induced syncope was supported by substantial evidence. Titterington continues to smoke a pack of cigarettes per day. He concedes that the substantial majority of his syncopal episodes are cough-induced. His syncope has never been clinically observed, despite extensive testing. Diagnoses that his syncope has unknown etiology do not prove that it has a cause other than his cough. His doctors' reports of non-cough-induced syncopal episodes consist of nothing more than their repetitions of what he reported to them. Further, because the burden of proof to establish his disability rests with Titterington, the lack of specific etiological diagnoses makes it more difficult, not easier, for him to meet that burden. The above factors, discussed by the ALJ, constitute substantial evidence for his finding that Titterington's syncope was cough-induced.

Titterington also argues that the ALJ improperly discounted Dr. Gent's finding of disability. He claims that Dr. Gent's finding that he could not perform full-time sedentary work was not considered by the ALJ. He further claims that the only finding that he could perform sedentary work came from the state agency, a source the ALJ discounted. Accordingly, Titterington argues that the ALJ erred in his finding that his RFC included

sedentary work.

Again, this finding was supported by substantial evidence. The ALJ considered and discussed Dr. Gent's opinion but found that the disability finding therein was based on Titterington's syncope. The ALJ's diagnosis of cough-induced syncope provided a principled basis to depart from Dr. Gent's findings. The ALJ's RFC finding addressed Dr. Gent's principal concerns. Indeed, in restricting Titterington to sedentary work, rather than light work, it went further in some respects than Dr. Gent had gone. There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC. Surveying the medical evidence to craft an RFC is part of the ALJ's duties. A reasonable factfinder, considering the evidence in the record, could well have agreed with the ALJ that Titterington could perform sedentary work.

At step four, the ALJ concluded that Titterington's condition prevented him from returning to his past work. Relying on the vocational expert's testimony, the ALJ concluded that Titterington's past work was not sedentary and that his work skills did not transfer to work within his RFC. At step five, the ALJ concluded that Titterington's RFC did allow him to work at jobs that existed in significant numbers in the national economy. Applying medical-vocational rule 201.28 of 20 C.F.R. pt. 404 subpt. P. app. 2 and the testimony of the vocational expert, he found that an individual of Titterington's age, education, work experience, and RFC could perform work as a cashier, alarm monitor, or

11

hand packer, jobs with a total of 725,000 jobs in the national economy. He, therefore, concluded that Titterington was not disabled. Titterington does not dispute that the conclusions at steps four and five were justified given the ALJ's assessment of his RFC. Because that assessment was supported by substantial evidence, so also was the determination that Titterington was not disabled.

We will uphold the Commissioner's determination and affirm the judgment of the District Court.